Case number 151179, as is becoming common around here, is another appeal from the Patent Trademark and Appeal. Okay, Mr. Jacobin? I should have figured that out. You want five minutes for rebuttal? Yes, please. Okay. You may begin. May it please the Court. The claim amendments issued here today were made by Netlist after the issued 537 patent claims during reexamination were rejected based upon hierarchy. Inphi contended, and the examiner agreed, that the prior art actually shows the original novelty of the invention. Okay, well let's get to the heart of your argument. I mean, you don't dispute that the spec in the 537 does distinguish among the various DDR, CS, CAS, RAS, and bank address, right? I would agree that as to chip select, RAS, CAS, and bank address, it does distinguish those in embodiment, yes. Okay, but as I understand your argument, what you are saying is that you need an affirmative explanation as to why one is better than the other, before you can have a narrowing amendment. Is that right? No. What I'm saying is that because the prior art allows for RAS and CAS to also be used as chip select, if you were to use, for example, the manner in which the MPE would explain it, you would need to have an example of it being where chip select was used with RAS and CAS, and an example where you had as what is in the patent, the separate chip select, RAS, CAS, and bank enable, which is just used throughout the specification. So, what is it that they would have to have done to, in your mind, satisfy Santars? They would have had to give a reason to exclude, rather than just to distinguish. Does Santars require a reason? It does. The Santars standard requires a reason to exclude. The argument is that Santars creates and establishes this bright line rule. Santars states that there has to be some reason to exclude that is within the originally filed specification, and which was within the possession of the inventors at the time the application was written. My problem is that you say that Santars requires an explicit statement of a reason to exclude. I don't think that we're going that far, Your Honor. What I'm saying is that there needs to be something that allows you to distinguish, and what we have here is a specification that in, for instance, what the board relied on, Table 2 has it used as what it called an intrinsic exclusionary indicator, and then it pointed to an X, which, of course, everyone thinks X, exclusion, but it's actually not. It's just a don't care state, and then as well, Figure 9A, which, again, was for any kind of memory, but they're all consistently saying the same thing, that here is an embodiment which has CAS, RAS, chip select, and bank address. What if we were to interpret that logic table, Table 2, as identifying an example where you have the chip select signal, but the other ones, you know, CAS, RAS, bank address, when it says don't care, it contemplates necessarily that there's an example that the spec is contemplating where all of those other signals are just turned off, and so, therefore, what we have in the table is an example which is just exclusively using chip select signals, and not the others, the bank address signal, the CAS, and the RAS. I agree that that would be an example, but is that? Okay, and so there's an argument, I think, that the board is making that this is demonstrating that the inventor is showing us that there's a reason to exclude those other signals in favor of just working exclusively with chip select signals. You would say that's not a good enough disclosure in the patent because why? Well, there's a number of reasons. To begin with, in the prior art, and that's the reason that the original claims were rejected, which just said chip selects, that chip selects don't have to come from just a chip select signal. Let's assume for the moment that Table 2 is differentiating between chip select signals and the RAS and the CAS. But I would agree with you that it does. Okay, so then... And so what I'm saying is that because, to use an analogy maybe, you can teach golf as a sport, but that doesn't exclude you teaching all sports, meaning that doesn't mean you haven't taught football. The point here is that the chip select is a very broad term. Netlist itself, in litigation with respect to the parent patent to this particular patent, the parent patent was a 386 patent, I believe, they construed chip select as an address signal that enables the input and output of data to and or from a memory device. Their opposition, page 16, A1244, for the record. And so they've already, by that construction, shown that chip select can be very broad. It can be many things. Don't both Johnson and MPEP itself provide for the proposition that the patentee has the right to determine the scope of its claims, and if the patentee chooses to not continue with that argument as to the breadth of its claims, and agree that its claims exclude certain things, why don't they have the right to do that as long as the specification supports it? Well, I would agree with you as long as the specification supports it. But what the MPEP contemplates is that you give alternatives. And so that you say there's one way of doing it, and then there's another way of doing it. And so because there's these two different ways, I will let you have this one way and exclude the other. Well, you agreed with me as the opening proposition that these are listed as alternatives in the specification. No, I would not agree with that, Your Honor. These are listed as a combination of signals that can implement a memory device signaling, if you want to call it that, in a particular way. But what you argued in your brief, and if you look specifically in your gray brief, you say that actually it doesn't matter if you list something in a specification as alternative. You actually have to have expressed a preference for one or the other. If we did, I believe that is an overstatement, Your Honor. That is not my understanding of the law. I believe you need to have some reason to exclude there, but I do not believe that it needs to be expressed. And just so I understand your case, if we conclude that there is substantial evidence in the record to support the Board's fact-finding that differentiate chip-select signals from RAS and CAS, then do you lose? Not necessarily. It depends if you also believe that, as a matter of law, the Board also properly found a reason to exclude. So I think that is part of your case is there maybe are competing conceptions of what Santoros meant when it said reason to exclude. What is your conception? Well, in my conception, you have a case in Santoros where the original patent— Let's just talk about what, if you were to do an interpretation of the phrase reason to exclude, what is the legal principle that you think we should be adopting for what does reason to exclude mean for a negative limitation with respect to written description? I think that there needs to be something in what was originally filed in this specification, at the time of the original filing, that shows some support for the exclusion that is being contemplated, whether it's via the examples that the NPEP suggests. I mean, of course it would be fabulous if it would be expressed, but I'm not suggesting that it goes that far. I believe that the Patent Office and patent practitioners do need to have the ability to sort of reword their claims based upon what is, I'll say, inherent in the specification. Okay. So I just wanted to make sure that you're not urging a position that the specification has to be advocating for one particular thing— No. —and denigrating the other alternatives. Correct. No, not advocating for that at all. Okay. Okay. So let's go back to your analogy. So putting aside obviousness questions, so if we had someone who claimed a particular strategy for football and said that, you know, a coaching strategy, for instance, and then said you could also use this for soccer or hockey or basketball, are you saying that you can't turn around and exclude everything except football? I'm saying there that you at least talked about the other sports. Here what we have is silence. Here we have one way of doing it that had RAS, CAS, chip select, and bank address, but there was no discussion of any other ways, and it's just silence. And therefore, it's not enough for the negative limitation that exists. I find that I'm under my time, so— You want to save your time? I'll save my time for this one. Okay. Thank you. Thank you. Okay. May it please the Court, the Board's factual finding of written description support requires affirmance because it was based on substantial evidence. First, the Board correctly found that Table 2 and Figure 9A of the specification expressly exclude CDR chip select signals from RAS, CAS, and bank address signals. Second, the Board found that the explicit exclusion— Can you explain to me what's going on in Table 2? Because now I take it you agree that it's not listing a series of embodiments, right? Which is what the Board says. Your Honor, it's certainly directed to synchronous DRAM devices, which include DDR. Yeah, but these are not a whole list of different embodiments. Is that right? Well, Table 2 reflects one embodiment of the claimed invention, Your Honor. And if I may direct you, the column on the left is the chip select column, and then the next column is the RAS column, and the next column is the CAS column. I'm at A41, column 18. Our position is that each separate column reflects what is well known in the art, that each of these single signals in the SD RAM, specifically the DDR SD RAM space, have a separate and distinct function. And in the case of the chip select, it basically qualifies the other signals. So when the chip select is 1, that means that the chip is not selected. When the chip select is 0, as in the second row, then the other signals, the values of those other signals, determine what the command will be to the memory device. For example, to activate a row, to read or write, and those commands are set forth here. So with your narrowing limitation, the chip select would always have to be at 1, right? Well, the chip select, in our view, as a signal, is exclusive of these other signals, RAS, CAS, and in figure 9-8, the bank address signal. It always is on its own, a separate and distinct function. And we had, in the re-examination, we had Dr. Seachin provide, without rebuttal, an explanation of these specific signals and how they would be understood to one of the ordinary skilled in the art. And he specifically stated, and here I'll direct you to A1831, paragraph 38. He said, there is no possibility that a POSITA would confuse RAS, CAS, and bank address signals with DDR chip select signals. In the context of DDR memory devices, each of the above control signal names is a well-known term of art and associated with well-known distinct and separate functions performed by each type of signal. A POSITA would understand that a DDR chip select signal does not include RAS, CAS, or bank address signals, nor does it depend in any way on the RAS, CAS, or bank address signals. This testimony was unrebutted, and we think that the distinction is very clear, both in the spec and from this testimony of how one of the ordinary skilled in the art could understand table 2 and figure 9-8. Now, you argue that those other RAS, CAS, that they would actually render the device inoperable, right? Correct. I don't see that in the specification. Where is that in the spec? Well, I think, Your Honor, that would be self-evident from table 2, that each of those signals, being in their separate column, and specifically with respect to Dr. Seachin's testimony, each of those signals has a separate and distinct function. And so when Professor Seachin says, nothing replicates the action of a DDR chip select signal in paragraph 38, that means that if you try to substitute one of these other signals for a DDR chip select signal, it's going to fail. And I think it's very clear from the record that one of ordinary skilled in the art would understand it that way. Okay. Your counsel on the other side today is focusing more on the fact that he doesn't believe that there is a differentiation between these signals that appears in the specification, either in table 2 or otherwise. And in his briefing went on to say that even if there was a differentiation, that that's not enough in and of itself. What's your response to the second argument? My response to the second argument, Your Honor, is that we think that's sufficient under Santoris. Santoris requires a basis for the limitation, just as in any written description support case. And we think that the expressed distinctions in table 2 and figure 9a provide support for the negative limitation. If Your Honor believes that additionally a reason is required, we believe that the substantial evidence in the record establishes that there is a reason. Because as we explained, Professor Steichen said that nothing replicates the action of a DDR chip select signal. And that would tell one of ordinary skilled in the art that if you try to use one of these signals for a DDR chip select, the system would fail. And that's sufficient evidence in the record for a reason to exclude, if that's how you read Santoris. OK. Well, let's go to how we read Santoris. Because it's always dangerous, obviously, to read a majority opinion in light of a dissent. Because a dissent can characterize the majority opinion any way it wants to, and it's not necessarily what the majority said. But here, we do have a dissent that very specifically and expressly characterizes the majority opinion. And the majority opinion at least doesn't directly take that on. So why shouldn't we believe that the dissent's view of the majority opinion is an accurate one? Well, I think if you're referring to Judge Newman's statement that there's a new rule that the specification must describe a reason for the claim limitation, I think counsel has conceded that you don't need an express reason in the specification. The specification under Federal Circuit law is always read in view of one of ordinary skilled in the art. And we think that that disclosure, particularly Table 2 and Figure 9a, would make it very clear to one of ordinary skilled in the art that if any of these signals were used for a DDR chip select signal, the system would fail. And that's enough of a reason. Right, the board relied on the JEDEC standard, but that's not actually required by the patent, right? That's right, Your Honor. So why is that relevant? Why should we consider that? Because, Your Honor, the JEDEC specification simply states the state of the art here. It shows that this is a standardized distinction, as Professor Sietchan said without rebuttal. It's a standardized distinction of these four signals in the context of the DDR, DRAM device, which the claims are limited to. And so we think that the JEDEC specification is simply consistent with how one of ordinary skilled in the art would read Table 2 and would read Figure 9a. And that's exactly what Professor Sietchan also said in his declaration at paragraphs 37 and 38. Your opposing counsel talked about how the term chip select signal is actually an umbrella term, that it includes chip select signals, but it also includes RAS and CAD signals. And so you don't have anything in your spec that specifically carves out real chip select signals from the umbrella term chip select signals. Do you follow what I'm asking and what is your response? I would disagree with that, Your Honor. When we narrowed the claims to DDR, DRAM devices, I think we made it very clear that we're in the SDRAM space, and in that space the DDR chip select signal is distinct and separate from RAS, CAD, and bank address signals. And that's very clear from the specification as set forth in Table 2 and Figure 9a, and it's very clear from Professor Sietchan's un-rebutted testimony. If all of this would have been clear to one of skilled in the art, why did you even need the narrowing limitation? Your Honor, it was belt and suspenders. Oh gosh, we got that in the last argument. We don't need any more belt and suspenders. I kept hearing that and I kept thinking about that as well, but yes, it is belt and suspenders. You know it's really tacky to have belt and suspenders. Sorry. And if you look at the board's decision, particularly on the Wong and Johnson ground, they actually just rely, I mean they refer to chip select and then DDR chip select and they actually don't even refer to the negative limitation. I think one of ordinary skilled in the art would clearly understand that when you're claiming a DDR chip select, it's not RAS, CAD, and bank address signals. And I think that's very clear from the spec and it's very clear from the testimony. Your Table 2, it doesn't say DDR chip select. It just says chip select. It just says CS. How do we know that in the inventor's mind or one of ordinary skilled in the art would claim that we're talking about a DDR chip select? Well, Your Honor, the telltale sign is that the chip select is being used in a command table. With the advent of synchronous DRAM devices, the chip select was used with other signals to establish commands. And you don't have to take my word for it. And I direct you to Dr. Wang's declaration at A1183 in paragraph 12. The last sentence, he says, in modern synchronous DRAM devices, a chip select is added so that chip select signal is used to enable read and write access by qualifying other signals at the rising edge of the clock signal. That's what Table 2 is showing, Your Honor. That brings Table 2 into SDRAM space, which DDR, SDRAMs are a part of. Do you have any further questions?  Thank you, Your Honor. Thank you. Your Honor, three points that I'll make. We heard a number of times that their expert, Dr. Session, said without rebuttal that the claims as limited to DDR would be understood in this way and that they would be, quote, inoperable. What we have here truly is Dr. Session saying the DDR would be a JEDEC standard DDR and that if you didn't then implement the invention without a separate chip select RASCAS and bank enable, then they would not be operable as it relates to a JEDEC standard DDR. The problem with that whole line of logic is that the claims are not limited to a JEDEC standard DDR. But the spec does incorporate by reference the JEDEC standard, doesn't it? Not for any specific reason. It incorporates a very, very large document and says, I incorporate it by reference with no statement whatsoever for what the purpose is other than here it is. So the claim doesn't require that, but the specification certainly that adds to the question of whether the spec or adds to the debate at least as to whether the spec contains a reason to differentiate. I would say that, Your Honor, that the reference to the JEDEC at best just merely supports the same example that they have, but doesn't give a reason to exclude as required by Santeros. There is a heightened standard of scrutiny to a negative limitation that Santeros requires. Okay, and what, so tell me what a reason to exclude would look like. A reason to exclude in this instance would look like an example that says there are other implementations because remember that the claims originally weren't directed to DDR. The point of novelty of the invention as sort of originally set forth is no longer in the case. The examiner has found that to be invalidated and the netlist has acceded to that. So the translation aspect is no longer there. So what it would look like is here is an example with RAS and CAS being used as a chip select and also then having translation so that you could contrast the manner in which the DDR2 chip select operates from the manner in which other memories that also use RAS and CAS as a different, as chip select generically has historically been used. So you're going back to this comparative analysis. I'm comparing something, I'm not saying you have to distinguish. I'm saying you have to compare, you have to have an alternative, you have to have something there, you can't just have silence. You said that you think Santeros announced a heightened standard for written description of a negative limitation and I'm just wondering why is that so? Santeros didn't speak in those terms. It just talked about there needs to be a reason to exclude. Agreed. And why can't that just be the historical notion of are there blaze marks in the spec that communicate that the inventor contemplated a certain outcome? Because if you're after the fact as we are here 10 years later putting in a limitation to the claims that clearly you don't know that the inventor was in possession of that at the time, then that is the problem. It gets back to whether the inventor actually had possession of this idea back at the time he wrote the specification. I've only got a couple, less than one minute left, but the one thing that I did want to talk about was he said that it was a belt and suspenders as to why they put the negative limitation in. Our position is they can't have it both ways. They can't argue that one of ordinary skill in the art would know that DDR meant all these things. But then at the same time have added the negative limitation with no consequence. Thank you.